UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

CAMBRIANS FOR THOUGHTFUL
DEVELOPMENT, U.A., JOHN MUELLER,
and LEONORE NEUMANN,

                Plaintiffs,

      v.                                   Case No. 09-C-0139-C

DIDION MILLING, INC., and
DIDION ETHANOL, LLC

                Defendants.

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, Cambrians for Thoughtful Development, U.A., John Mueller, and

Leonore Neumann (collectively, "Plaintiffs," or "Cambrians"), by their attorneys,

McGillivray Westerberg & Bender LLC, respectfully move this Court for an order

grating partial summary judgment pursuant to Fed. R. Civ. P. 56, finding as a matter of

law on liability in Plaintiffs' favor as to specific violations of the Clean Air Act on

specific days.

Defendants Didion Milling, Inc. and Didion Ethanol LLC ("Didion"), have

repeatedly violated the Clean Air Act ("Act" or "CAA").  The violations include

violations of the Wisconsin State Implementation Plan ("SIP") and provisions of two

separate air pollution control permits issued by the Wisconsin Department of Natural

Resources ("DNR") intended to control particulate matter from Didion's facilities in

Cambria, Wisconsin, as well as recordkeeping and notice requirements of the SIP and

Didion's permits.  Plaintiffs, a local citizens' group and individual residents of the area

around the milling and ethanol plant, ask the Court to find Didion liable for these

violations, which are more fully set forth below.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence on record shows "that there is

no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  As the Court explained in *Anderson*

*v. Liberty Lobby*, the summary judgment standard "provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no *genuine*

issue of *material* fact."  477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986)  (emphasis in original).

"Genuine" issues are those upon which "a reasonable jury could return a verdict for

the nonmoving party."  *Id.* at 248.  "Material" facts are identified by the substantive law

of the case.  *Id.*  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment.

Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  (citations

omitted).

On summary judgment, the moving party demonstrates there is no genuine issue

of material fact for trial by showing "that there is an absence of evidence to support the

nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986). The burden then shifts to the non-moving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Id.* at 324. In considering summary judgment, all inferences must be drawn in the light most favorable to the non-moving party, giving him the benefit of all conflicts in the evidence. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999). However, the non-moving party may "not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (internal quotations omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) (citation and internal quotation marks omitted).

Here, there are no material facts in dispute related to Defendant's various violations of the Clean Air Act on specific days. Therefore, the Court should find that the Defendant violated the Act as to those days. Remaining for trial will be Defendants' violations on additional days, where there appears to be the possibility for a contested issue of fact.

## <u>JURISDICTION AND VENUE</u>

This case is a citizen suit pursuant to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, which therefore raises a federal question for which this Court has subject matter

jurisdiction.  28 U.S.C. § 1331; 42 U.S.C. § 7604(a). Venue is appropriate in the Western District of Wisconsin because this is where the Didion Milling, Inc., facilities at issue are located, and the events or omissions giving rise to the claims occurred.  28 U.S.C. § 1391(b); 42 U.S.C. § 7604(c)(1).

Plaintiffs served their Notice of Intent to Sue letter, pursuant to 42 USC § 7604(b)(1), on the Defendants on February 18, 2008.  PPFOF ¶¶ 2.  Plaintiffs further served their Supplemental Notice of Intent to Sue letter, asserting additional violations, on March 10, 2009.  PPFOF ¶¶ 5.  More than sixty days passed between the filing of Plaintiff's Notice of Intent to Sue and Supplemental Notice of Intent to Sue and Plaintiff's original and amended complaints.  PPFOF ¶¶ 4, 9.  The events or omissions giving rise to the claims in this case occurred in Cambria, Wisconsin, which is in the Western District of Wisconsin.  PPFOF ¶ 10.

## THE STATUTORY STRUCTURE OF THE CLEAN AIR ACT

A.    *The Clean Air Act*

The Clean Air Act is designed to protect and enhance the quality of the nation's air and, in doing so, promote the public health and welfare and the productive capacity of the United States' population.  42 U.S.C. § 7401(b)(1).  The Act is Congress' attempt to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356; *see also Wis. Elec. Power Co. v. Reilly,* 893 F.2d 901, 909 (7th Cir. 1990) (hereinafter "*WEPCO*").

4

Pursuant to the Act, the United States Environmental Protection Agency ("U.S. EPA") has established National Ambient Air Quality Standards ("NAAQS") for "criteria pollutants," including sulfur dioxide ($SO_2$), nitrogen oxide ($NO_x$), ozone, particulate matter smaller than ten microns (PM10), particulate matter smaller than 2.5 microns (PM2.5), lead, and carbon monoxide (CO). 42 U.S.C. § 7602(e); 40 C.F.R. part 50. Areas where the ambient air meets the NAAQS are designated as "attainment" areas. 42 U.S.C. § 7407(d). Areas where the ambient air does not meet the NAAQS for a particular criteria pollutant, or areas that contribute to the ambient quality in downwind areas not meeting the NAAQS, are designated "nonattainment" for that pollutant. *Id.*

The CAA also includes the Prevention of Significant Deterioration (PSD) program, which intends to ensure that new sources of pollution, or increases in pollution from existing sources will only be added in a manner consistent with the preservation of existing clean air resources by preventing air quality deterioration in areas attaining NAAQS. 42 U.S.C. §§ 7470, 7475(a), (d). Another component of the PSD program is the requirement that every new or modified existing major source employ pollution controls that meet stringent "best available pollution control technology" (BACT) emission limit, developed through a "case-by-case" analysis of the maximum degree of reduction achievable. 42 U.S.C. §§ 7475(a)(4), 7479(3). Sources with the potential to emit pollution over the major source threshold can elect federally enforceable limits that, of observed, render it a "synthetic minor" source under the Act,

5

and therefore avoid having to comply with the PSD program and BACT. *United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 995, 1005 n.8 (E.D. Ky. 2007).

States are required to adopt plans to implement the federal Clean Air Act. 42 U.S.C. § 7410(a). These plans, called State Implementation Plans, or "SIPs," contain enforceable regulations that are designed, among other things, to achieve federally-determined air standards. *U.S. v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1062 (W.D. Wis. 2001). Pursuant to the Act, states propose SIPs to U.S. EPA, which are then approved by U.S. EPA by federal notice and comment rulemaking if the SIPs meet U.S. EPA's criteria for approval. 42 U.S.C. § 7410(k). Once a state's SIP is approved by U.S. EPA, it is published in the Code of Federal Regulations and can be enforced by the state, U.S. EPA, or citizens. 42 U.S.C. §§ 7413(a) and (b), 7604(f)(4); *Murphy Oil*, 143 F. Supp. 2d at 1062. "For entities regulated under the Clean Air Act, 'the burden is clearly on the source to do whatever is necessary to assure compliance.'" *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Refining, Inc.*, 399 F. Supp. 2d 726, 730 (E.D.La. 2005) (quoting 45 Fed. Reg. 59,874, 59,877 (Sept. 11, 1980)).

B.      *Wisconsin's SIP.*

Wisconsin has a U.S. EPA-approved SIP. *See* 40 C.F.R. § 52.2569, *et seq.* Among the provisions contained in the Wisconsin SIP are most provisions of Wis. Stat. ch. 285 as well as Wis. Admin. Code chs. NR 405, NR 406, NR 407, NR 415, and NR 439.

Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code §§ NR 406.03 and NR 406.10, which require an air pollution source (such as a grain storage facilities capable of

greater than 5,500 tons per month of throughput and more than 1 million bushels of storage capacity) to obtain and comply with a construction permit when the source is modified. The term "modification" for this program is defined as "any physical change in, or change in the method of operation of, a stationary source that increases the amount of emissions of an air contaminant or that results in the emission of an air contaminant not previously emitted." Wis. Admin. Code § NR 400.02(99).

The prerequisites for issuance of a construction permit to a source like Didion are listed in the SIP as follows:

> The stationary source will meet all applicable emission limitations and other requirements promulgated under [Wis. Stat. ch. 285]…; and

> The source will not cause or exacerbate a violation of any ambient air quality standard or ambient air increment under s. 285.21(1) or (2)

Wis. Stat. § 285.63(1)(a) and (b). Specifically, for sources in Class II attainment areas, such as Columbia County, permits must ensure that the source does not cause or contribute to air impacts greater than the ambient air standards in Wis. Admin. Code § NR 404.04 or the ambient air increments set forth in Wis. Admin. Code § NR 404.05(3). A source that causes or contributes to a violation of either type of standard would not satisfy Wis. Stat. § 285.63(a) and (b) and would not qualify for a permit.

Under the SIP, the Wisconsin Department of Natural Resources ("DNR") may impose conditions on any air pollution control permit, Wis. Stat. § 285.65, including monitoring, record-keeping, reporting, and compliance certification requirements, Wis. Stat. § 285.65(10), and requirements to submit compliance plans and schedules and

progress reports, *Id.* § 286.65(11).  Wis. Admin. Code § NR 406.10.  The Wisconsin SIP

further provides that it is a violation to "fail[] to construct a stationary source in

accordance with the application as approved by the [Wisconsin Department of Natural

Resources]" and/or to "fail[] to construct and operate a stationary source in accordance

with conditions imposed" by DNR.  Wis. Admin. Code § NR 406.10; see also Wis. Stat. §

285.60(7).

Other provisions of Wisconsin's SIP relevant to this action are discussed as

applicable below.

C.      *Citizen Suit Provision*.

The citizen suit provision of the Clean Air Act allows citizens, including

Cambrians, to commence suit in a United States district court for violations of an

emission standard or limitation.  42 U.S.C. § 7604(a).  An emission standard or

limitation is defined to include any emission limitation, standard of performance,

emission standard, any condition of a state SIP, any permit conditions, any New Source

Performance Standard, and any requirement to obtain a permit as a condition of

operations.  42 U.S.C. § 7604(f).  The citizen-suit provision of the Clean Air Act was

enacted "specifically to encourage 'citizen participation in the enforcement of the

standards and regulations established under this Act.'"  *Pennsylvania v. Delaware Valley*

*Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986) (quoting S.Rep. No. 91-1196, p. 36

(1970)).

8

"The Act also authorizes federal district courts to enforce emission standards or limitations and to impose appropriate civil penalties." *St. Bernard Citizens*, 399 F. Supp. 2d at 731 (citing 42 U.S.C. § 7604(a)). "A penalty may be assessed for each day of violation." 42 U.S.C. § 7413(e).

## FACTS[1]

Cambrians for Thoughtful Development is a citizens' group that came together in Cambria, Wisconsin in 2002. PPFOF ¶ 11. Its members live, work and recreate in and around the Village of Cambria, where Didion Milling, Inc., has owned and operated a milling plant for approximately nineteen years, and where its subsidiary Didion Ethanol, LLC has operated an ethanol plant for almost two years. PPFOF ¶¶ 12, 16, 17, 22, 23.

The milling plant mills corn and is a source of dust and particulate matter pollution. PPFOF ¶¶ 24-25. Particulate matter is an airborne finely divided solid or liquid material with an aerodynamic diameter smaller than 100 micrometers, also known as total suspended particulate ("TSP"). PPFOF ¶ 26. A smaller form of particulate matter is called PM10, is particulate matter with an aerodynamic diameter smaller than 10 micrometers. PPFOF ¶ 27. The United States Environmental Protection Agency ("U.S. EPA") describes PM10 as "inhalable course particles, such as those found near roadways and dusty industries." PPFOF ¶ 29. According to U.S. EPA, the adverse

---

[1] Plaintiffs provides a summary of background facts in this section. For a complete recitation of facts, Plaintiffs rely on their Proposed Findings of Fact filed with this memorandum of law ("PPFOF").

health effects of particulate matter include coughing or difficulty breathing, decreased lung function, aggravated asthma, development of chronic bronchitis, irregular heartbeat, nonfatal heart attacks; and premature death in people with heart or lung disease. PPFOF ¶ 28. Additionally,

> Studies have demonstrated that both fine and coarse PM can have negative effects on public health and welfare. For example, each is associated with increased mortality (premature death) rates and morbidity (illness) effects such as cardiovascular disease and decreased lung function. With regard to public welfare . . . both fine and coarse PM can damage vegetation, disrupt ecosystems, corrode metals, and erode paints and other building materials.

*Am. Farm Bureau Fedn. v. EPA*, 559 F.3d 512, 515-16 (D.C.Cir. 2009).

Didion has received air pollution construction permits from the Wisconsin DNR that govern its operations: Permit 06-DCF-166 on October 19, 2006, Permit 07-DCF-003 on September 4, 2007, and most recently, Permit 08-DCF-155 on September 9, 2009. PPFOF ¶¶ 37, 39, 42. Didion sought Permit 08-DCF-155 because, *inter alia*, "[e]missions tests of a number of the new and existing operations have revealed emissions in excess of that predicted within the prior application materials." PPFOF ¶ 42. Under its permits, the combined milling and ethanol plant is a synthetic non-Part 70[2] source and a synthetic PSD minor source. *Id.* ¶ 44. PSD minor source status allows Didion to avoid expenditures of money that are associated with determining (and potentially installing) BACT. *Id.* ¶ 44.

---

[2] Part 70 is a reference to Title V of the CAA. In 1990, Congress added Title V to the Clean Air Act, which established an operating permit program to ensure that all "applicable requirements" for each major pollution source are collected in one place. 42 U.S.C. § 7661-7661f. EPA's implementing regulations are codified in 40 C.F.R. part 70. 57 Fed. Reg. 32,250 (July 21, 1992). As such, permits issued under the operating program are referred to as Title V or Part 70 permits.

Didion has a poor environmental compliance record in Cambria.  PPFOF ¶ 45;
*Domino v. Didion Ethanol, LLC*, Western District of Wis. Case No. 09-cv-213-bbc, Opinion
& Order (Dkt. #42) (granting summary judgment to plaintiffs for violations of the Clean
Water Act); *see also United States of America v. Didion Milling, Inc.*, Western District of
Wis. Case No. 99-C-261-C, Order 3/1/00 (Mar. 1, 2000) (entering consent decree in case
alleging Didion Milling had violated the CAA by, *inter alia*, emitting excess particulate
matter at a Prairie du Chien location).  The violations in Cambria started when Didion
failed to obtain a permit for its operations there, even though it exceeded the CAA
permitting threshold of 5,500 tons grain/month throughput.  *Cambrians for Thoughtful
Development v. Didion Milling, Inc.*, 571 F. Supp. 2d 972, 975 (W.D.Wis. 2008) (finding a
notice of violation was issued to Didion in 2002).  And last year, this Court found that
Didion had indisputably violated its prior air pollution control permits by running its
grain dryer outside of permitted hours and failing to install certain particulate pollution
controls, though the case was ultimately dismissed on standing grounds.  *Id.* at 977.
The Court noted that other facts in plaintiffs' filings showed "there may be ongoing
egregious and chronic violations of distinctly different permit provisions," some of
which are at issue in this case.  *Id.* at 980.

The crux of the present case is again particulate matter pollution.  First, under the
Wisconsin SIP, Didion cannot cause or contribute to an exceedence of the 150 ug/m3
ambient air standard for TSP, yet samples Didion has recorded between April of 2007
and August 2008 showed TSP levels of up to 570 micrograms per cubic meter, due

11

primarily to grain dust.  PPFOF ¶¶ 56-100.  On some days—and in fact, for several

months—Didion has not monitored TSP at all, in violation of permit requirements to

conduct this monitoring.  *Id.* ¶¶ 46, 48, 105.  Second, Didion has constructed new

sources of particulate matter without a permit—specifically, three new grain

hammermills to serve the ethanol plant—in violation of its permits and the SIP.  *Id.* ¶¶

106-107.  Third, Didion has failed to operate fabric filter baghouses necessary to control

particulate matter from different processes within the required parameters, and has

further failed to record information necessary to assure the baghouses are in compliance

with permitted conditions.  *Id.* ¶¶ 125-145.  Fourth, Didion's own stack testing confirms

it has emitted excessive PM and PM10 emissions from its grain dryer.  *Id.* ¶¶ 146-171.

Finally, Didion has falsely certified its compliance with applicable requirements to the

DNR and has failed to timely report its violations.  *Id.* ¶¶ 172-178.

Plaintiffs are suffering the consequences of Didion's operations and excess air

emissions.  Individual Plaintiffs, who reside one-half mile or less from the milling and

ethanol plant, can see air pollution coming from the plant and falling from the sky.

PPFOF ¶ 14.  When it does and the wind blows the particulate matter in Plaintiffs'

direction, dust and other particulate matter fall from the sky, coating their outdoor

belongings with a sticky film or bits of corn hulls.  *Id.*  Mr. Mueller also knows the

milling and ethanol plant is a source of particulate matter pollution because he has read

and commented on the permits the DNR has issued to Didion.  *Id.*  He is extremely

worried about the impact the Didion facility's dust is having on his health, as well as the health of his family.  *Id.*

## ARGUMENT

Plaintiffs move for partial summary judgment on six of their eight causes of action, which relate to Didion's violation of the TSP ambient air standard and failure to monitor for additional violations, constructing three grain hammermills without a permit, failing to record and operating outside of allowable baghouse pressure ranges, emitting excess PM and PM10 from the grain dryer, and submitting false compliance certifications to the Wisconsin DNR.  Because Didion has violated the Wisconsin SIP and its permits, it has violated the Clean Air Act, and Plaintiffs move for summary judgment on Defendant's liability on 12,140 days of violation as set forth below.

A.   *Didion Failed to Monitor TSP and Exceeded Allowable TSP Limits in Violation of the Wisconsin SIP and its Permits.*  (Causes of Action 1 and 2, Second Amend. Compl., Dkt. 12.)

Wis. Admin. Code § NR 415.03, which is included in the Wisconsin SIP, prohibits "caus[ing] allow[ing] or permit[ing] particulate matter to be emitted into the ambient air which substantially contributes to exceeding of an air standard, or creates air pollution." One "air standard," within the meaning of NR 415.03, is Wis. Admin. Code § NR 404.03(3), which provides that "[t]he secondary standard for particulate matter measured as total suspended particulates is 150 micrograms per cubic meter - maximum 24-hour average concentration, not to be exceeded more than once per year."

To ensure compliance with the 150 ug/m3 standard for TSP, the DNR has

required Didion to operate an ambient air quality monitor to measure PSD as a condition of Didion's last three permits: Permit 06-DCF-166, Permit 07-DCF-033, and Permit 08-DCF-155.  PPFOF ¶¶ 46, 47, 105.  Each permit also requires Didion to report exceedences of the 150 ug/m3 TSP standard to DNR within 15 days of the exceedence's occurrence.  *Id.*  Generally, Didion is required to report any permit deviation within one business day.  *Id.* ¶ 175.

Didion's self-monitoring has shown violations of the TSP standard, sometimes at "egregious" levels.  Didion has also violated the Wisconsin SIP and its permits by failing to monitor TSP for months at a time.  Plaintiffs' motion for summary judgment should be granted on this issue as specified below.

### 1.  **Didion Has Violated the Ambient Air Standard for TSP**.

Didion's self-monitoring for TSP has revealed several violations of the 150 ug/m3 ambient air standard in Wis. Admin. Code § NR 404.03(3).

Pursuant to Permits 06-DCF-006 § I.V. and 07-DCF-003 § I.U., Didion located and operated a TSP monitor on the roof of its bulk loadout building ("the BLO monitor"). PPFOF ¶¶ 47, 49.  Didion periodically removes the filters and sends to a contracting laboratory for analysis.  *Id.* ¶¶ 50, 52.  The contractor analyzes the filters to determine the amount of TSP and whether the amount exceeds the 150 ug/m3 limit.  *Id.* ¶ 53.  If the amount exceeds 150 ug/m3 standard, the filters are sent to the Wisconsin State Lab of Hygiene for further analysis.  *Id.* ¶ 54.  The Wisconsin State Lab of Hygiene then analyzes the TSP captured in the filters to determine its composition.  *Id.* ¶ 55.

14

On the following dates, Didion recorded exceedences of the 150 ug/m3 TSP standard in the following amounts, and with the following composition of grain dust, on **13 days** in 2007 and 2008:

| Date | Amount of TSP (ug/m3) | Composition of TSP | PPFOF |
|------|------------------------|---------------------|-------|
| 4/30/07 | 570 | 95% biological material, almost entirely grain dust | ¶¶ 56-58 |
| 5/3/07 | 185 | 72% biological material, almost entirely grain dust | ¶¶ 59-61 |
| 5/18/07 | 193 | 77% grain dust | ¶¶ 62-64 |
| 5/24/07 | 166 | 47% grain dust | ¶¶ 65-67 |
| 5/30/07 | 167 | 72% grain dust | ¶¶ 68-70 |
| 6/11/07 | 173 | 65% grain dust | ¶¶ 74-76 |
| 6/13/07 | 296 | 68% grain dust | ¶¶ 77-79 |
| 6/29/07 | 234 | 83% biological material, almost entirely grain dust | ¶¶ 80-82 |
| 2/21/08 | 206 | 55% grain dust | ¶¶ 86-88 |
| 3/13/08 | 355 | 83% grain dust | ¶¶ 89-91 |
| 4/24/08 | 172 | 30% biological material, primarily grain dust | ¶¶ 92-94 |
| 7/29/08 | 155 | 59% biological material, almost entirely grain dust in the form of cornstarch grain | ¶¶ 95-97 |
| 8/4/08 | 263 | 72% biological material, almost entirely grain dust in the form of cornstarch grain | ¶¶ 98-100 |

On July 18, 2008, DNR notified Didion that the TSP monitoring results from the BLO were acceptable and valid.    PPFOF ¶ 101.

In a May 2007 email, DNR compliance inspector Sloat characterized the April and May 2007 TSP exceedences as "rather egregious," both because of their severity and frequency.  PPFOF ¶ 71.  He subsequently issued Didion a letter of non-compliance for these violations, assigning culpability to Didion for the exceedences "[s]ince Didion

15

Milling is the only operation that may be a source for the grain dust during this time frame." *Id.* ¶ 72.  No other significant source of grain dust has been added to the area since April and May 2007, and the TSP monitor continued to capture significant amounts of grain dust during and after June 2007 as indicated in the table above.  *Id.* ¶ 73.

For the 13 dates identified by Didion's own monitoring, *supra*, Didion has violated caused, allowed, or permitted particulate matter to be emitted into the ambient air at levels that substantially contribute to exceeding of the 150 ug/3 ambient air standard in violation of the Wisconsin SIP, Wis. Admin. Code §§ 415.03, 404.03(3).  *See Grand Canyon Trust v. Public Serv. Co.*, 294 F. Supp. 2d 1246, 1247 (D.N.M. 2003) (finding facility's self-recorded opacity data could be prima facie evidence of a CAA violation in a citizen suit enforcement action).  Sometimes these violations have significantly exceeded the 150 ug/m3 limit—in one case, by nearly four times.  PPFOF ¶ 57; *see CTD v. Didion*, 571 F. Supp. 2d at 980 (noting it was undisputed that Didion had several emission levels violations that may be egregious and chronic).

Plaintiffs move for summary judgment on the **13 dates** Didion's monitor recorded exceedences, as set forth above.

2. **Didion Failed to Monitor Ambient Air Quality for Several Months and Failed to Report its Monitoring Lapses, in Violation of its Permits and the SIP.**

Didion's self-monitoring may well have revealed additional violations of the TSP standard had Didion not failed to conduct *any* monitoring for several months.

As Didion admits, it failed to conduct any TSP monitoring from July 5, 2007, through February 18, 2008, a period of **229 days**.  PPFOF ¶¶ 83-84.  Indeed, the employee responsible for conducting the monitoring failed to do so **specifically because he was concerned the monitoring would reveal additional violations** of the TSP standard.  *Id.* ¶ 84.  Didion's records show it also failed to take any valid readings from its TSP monitor from December 26, 2008, through February 15, 2009, a period of **51 days**.  PPFOF ¶ 102-104.

Didion's failure to monitor is a violation of Permit 06-DCV-166 § I.V.1.a. and Permit 07-DCF-003 § I.U.1.a., which required Didion to conduct the TSP monitoring during the July 2007-February 2008 and December 2008-February 2009 time periods.  PPFOF ¶¶ 37, 39, 46, 48.  Didion also violated each permit's prohibition on failing to operate the milling and ethanol facility contrary to the permitted conditions.  PPFOF ¶ 177.   These permit violations are, in turn, a violation of the Wisconsin SIP at Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code § NR 406.10, which require an air pollution source to comply with a construction permit.

As if failing to monitor were not bad enough, Didion compounded the problem by failing to report its lack of TSP monitoring from July 2007-February 2008 until February 13, 2008.  *Id.*  Such reporting was required by Permit 06-DCF-166 and 07-DCF-003 § II.D.1, which requires reporting permit deviations (such as failure to monitor per permit conditions) by the next business day.  PPFOF ¶ 175.  Didion accordingly violated its permits from the period of July 6, 2007, the day after its first violation, through

17

February 12, 2008, the last day it failed to report. This is a period of **221 days**. These permit violation is in turn a violation of the Wisconsin SIP at Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code § NR 406.10, which require an air pollution source to comply with a construction permit.

These notifications are not a mere recordkeeping formality. Once the DNR is notified of a violation, it can begin to address the problem with the source. A written notice is all the more important, because a citizen can then request it from the DNR via an open records request or other means, and thereby inform him or herself about air emission violations in the community. Wis. Stat. § 19.31 et seq. Yet Didion has deprived the State an opportunity to remedy violations proactively and citizens the opportunity to become informed about those violations when it has failed to provide proper notice of the violation to the DNR.

For these reasons, Plaintiffs move for summary judgment against Didion for violating the Wisconsin SIP on the **13 days** it caused or contributed to an exceedence of the 150 ug/m3 air standard. Plaintiffs also move for summary judgment against Didion for violating its permit on the **229 days** it failed to conduct any TSP monitoring between July 2007 and February 2008, and the **51 days** it failed to conduct any valid TSP monitoring between December 2008 and February 2009. Plaintiffs similarly move for summary judgment against Didion for violating the Wisconsin SIP for the **229 and 51 days** it failed to conduct any TSP monitoring as required by its permit, since the SIP prohibits operations in violation of a permit. Plaintiffs also move for summary

18

judgment on the **221** days Didion failed to report its failure to conduct monitoring as required by its permit, which is also **221** days in violation of the Wisconsin SIP as set forth above.  This amounts to **<u>1,015</u>** days of violations relating to the TSP standard, monitoring, and reporting under Plaintiffs' first and second causes of action.

      B.    *Didion Has Violated the Wisconsin SIP and its Permits by Constructing a New Source of Air Pollution, Grain Hammermills, Without a Permit.*  (Third Cause of Action, Second Amend. Compl., Dkt. 12.)

Plaintiffs' Third Cause of Action alleges that Didion constructed and operated a grain hammermill without the proper permit, resulting in violations of the Wisconsin SIP, Permit 07-DCF-003, and the CAA.  As shown below, Didion wrongfully constructed the grain hammermills, and summary judgment should be granted to Plaintiffs as set forth below.[3]

## 1. Didion Violated the Wisconsin SIP by Constructing Three New Grain Hammermills Without a Permit.

As noted above, the Wisconsin SIP prohibits construction or modification of a stationary source without obtaining a construction permit.  To wit, Wis. Stat. § 285.60(1)(a)1. provides that "no person may commence construction, reconstruction, replacement, or modification of a stationary source unless the person has a construction permit from the [DNR]."  Wis. Admin. Code § NR 406.03 contains the same requirement, though it allows sources to obtain a waiver of construction permit requirements upon submittal of a complete construction application and demonstration

---

[3] Plaintiffs do not move for summary judgment on their allegation that Didion improperly operated the grain hammermills.

that undue hardship will be caused if a waiver is not granted. Wis. Admin. Code § NR 406.10 makes clear that "any owner or operator who commences construction or modification of a stationary source without applying for and receiving a permit as required under this chapter . . . shall be considered in violation of s. 285.60, Stats."

Didion brazenly violated Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code §§ NR 406.03 and 406.10 when it constructed three new grain hammermills at the milling plant site. Starting on or around September 4, 2007—the same day it received Permit 07-DCF-003—Didion began constructing the hammermills, which would serve its new ethanol plant. PPFOF ¶¶ 39, 106. Didion's application for Permit 07-DCF-003 did not seek permission to construct or operate the three new hammermills, and instead stated the ethanol plant would use the facility's existing grain hammermills. *Id.* ¶ 108. Accordingly, Permit 07-DCF-003 did not authorize construction or operation of the three new grain hammermills. *Id.* ¶ 107.

DNR Compliance Inspector Michael Sloat happened to visit the Didion facility on September 26, 2007, and observed the hammermills under construction. PPFOF ¶ 109. On October 4, 2007, Didion sent DNR a short letter claiming the hammermills "currently under construction" would not discharge emissions to the atmosphere, and did not request a construction permit waiver. *Id.* ¶ 110. DNR Air Permit Engineer Don Faith requested further information about the hammermills on October 10, 2007, and January 9, 2008, and notified Didion that its October 4, 2007, letter was not an adequate construction permit exemption request even if Didion had intended to ask for one. *Id.* ¶

20

111.  He also stated that "the presence of [the three new hammermills] can reasonably be expected to result in higher actual emissions than if the units were not present."  *Id.* ¶ 114.

Didion finally submitted a construction permit exemption request for the three new hammermills on February 6, 2008—five months after it commenced construction. PPFOF ¶ 116.  Mr. Faith denied the request one week later based on "the process being a conventional ('high energy') hammer mill process that creates significant quantities of grain dust that requires collection and control of the air flows/exhausts to limit the emissions."  *Id.* ¶ 117.  Mr. Faith further based his determination on the fact that the hammermills were "a portion of the project to construct a fuel grade ethanol facility," and that had the project been identified in the applications for Permits 06-DCF-166 or 07-DCF-003, "the permit would have included applicable limitations for this milling operation."  *Id.* ¶ 118.

DNR subsequently issued a Notice of Violation to Didion for constructing the hammermills without a permit, and scheduled an enforcement conference due to the seriousness of the violations.  PPFOF ¶¶ 119-120.  At the conference, DNR emphasized that Didion has an obligation to notify the DNR prior to the start of any work, which Didion should have known because of enforcement issues surrounding Didion's prior construction of facilities in Cambria without a proper permit.  *Id.* ¶ 120.

Didion submitted an application for a new construction permit, Permit 08-DCF-155, on June 20, 2008, in part to rectify its prior failure to identify the three grain

21

hammermills as sources of emissions and obtain limits on those emissions. PPFOF ¶¶ 41, 121. Under Permit 08-DCF-155, it took fabric filter baghouse control, hourly emission limits for PM and PM10, and compliance emission testing to properly control emissions from the hammermills. *Id.* ¶ 112. In fact, the emission limits on the hammermills were necessary to attain and maintain NAAQS and air increment for PM10, and to preserve the milling and ethanol plant's minor source status under Part 70 and PSD. *Id.* ¶

Didion clearly violated Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code §§ NR 406.03 and 406.10 when it constructed the three new grain hammermills. It should have been, and possibly was, evident to Didion that this source would require a construction permit, given the type of source and the permit limits the hammermills eventually needed. Because Didion did not obtain a construction permit prior to commencing construction on the three new grain hammermills, it violated the Wisconsin SIP, and therefore the Clean Air Act, for **736 days**. This is the number of days between September 4, 2007, when construction commenced, and September 9, 2009, when the hammermills were finally permitted under Permit 08-DCF-155. Summary judgment should be granted to Plaintiffs on Defendants' liability for these dates.

2. **Didion Violated Permit 07-DCF-003 by Constructing Three New Grain Hammermills Without a Permit.**

Didion also violated the terms of Permit 07-DCF-003 by constructing the three grain hammermills. Violating the permit is also a violation of the SIP.

Permit 07-DCF-003 § II.H. provides, in relevant part,

> No person may commence construction, reconstruction, replacement, relocation or modification of a stationary source unless the person has a construction permit for the source or unless the source is exempt from the requirement to obtain a permit under s. 285.60(5), Wis. Stats., or under ch. NR 406, Wis. Adm. Code. Applications for the construction permit shall be submitted on forms which are available from the Department at its Madison headquarters and district offices. [s. 285.60(1)(a), Wis. Stats.]

PPFOF ¶ 176.  A similar provision is contained in Permit 07-DCF-003 § I.ZZZ.3.  Permit 07-DCF-003 § II.L. also provides that "[a]ny owner or operator who fails to construct a stationary source in accordance with the application as approved by the [DNR] . . . or who fails to construct and operate a stationary source in accordance with the conditions imposed by the [DNR] under s. 285.65 . . . shall be considered in violation of s. 285.60, Wis. Stats." This parallels the language of the Wisconsin SIP, in Wis. Admin. Code § 406.10, which prohibits Didion from violating its permits.

By constructing the three new grain hammermills without authorization in a construction permit as explained above, Didion violated Permit 07-DCF-003 §§ II.H and § I.ZZZ.3.  Similarly, because Didion did not construct the milling and ethanol facility in accordance with its permit application, which contained no hint of the three new grain hammermills, PPFOF ¶ 108, Didion violated Permit 07-DCF-003 § II.L.  Furthermore, because a person who obtains a construction permit is required to comply with all terms and conditions of the permit under Wis. Stat. § 285.60(7), Wis. Admin. Code § 406.10, Didion has violated the SIP by violating its permit.

Plaintiffs move for summary judgment against Didion for failure to follow Permit 07-DCF-003 from September 4, 2007, the day the permit was granted, to September 9, 2009, when permit 08-DCF-155 was issued, a period of **736 days**.  Plaintiffs

23

also move for the **736** days Didion violated the SIP by failing to follow an issued
construction permit.

> **3.   Didion Violated the Wisconsin SIP by Failing to Revise its Pending Operating
> Permit Application to Identify the Grain Hammermills.**

In addition to regulating construction of emissions sources, the Wisconsin SIP
also regulates their operation.  Per Wis. Stat. § 285.60(1)(b), "no person may operate a
new source or a modified source unless the person has an operation permit under s.
285.62 from the [DNR]."  However, the SIP also provides that a construction permit
may serve as a facility's initial operating permit on order to assess how a facility's
operations are running before the operating permit is issued.  Wis. Stat. § 285.60(1)(a)2.
When an operating permit application is submitted, it must contain a variety of
information, including a description of the source's processes and products and
emissions-related information.  Wis. Admin. Code § 407.05(4).  Wis. Admin. Code §
407.05(9) also provides that "[a]n applicant who has failed to submit relevant facts or
has submitted incorrect information in a permit application shall, after becoming aware
of this fact, promptly submit the supplemental or corrected information."  Needless to
say, "[a]ll material statements, representations and certifications in a permit application
shall be truthful."  *Id.* § 407.05(9).

When Didion applied for construction Permit 07-DCF-003, it also applied for an
operating permit.  PPFOF ¶ 38.  Permit 07-DCF-003, once issued, authorized initial
operation of the milling and ethanol facility but was not an operating permit.  PPFOF ¶
39.  Before Didion could obtain an operating permit, it again applied for another

construction and operating permit. PPFOF ¶ 41. In other words, because of the frequency with which it submits permit applications and receives construction permits, Didion essentially operates under its construction permits and has not received an operating permit.

As Permit Engineer Faith noted in his October 10, 2007, letter to Didion, whether or not Didion believed the three new grain hammermills were exempt from operating permit requirements, Didion should have identified the hammermills with the application for Permit 07-DCF-003. PPFOF ¶ 113. He also stated that Didion had an obligation to amend its operating permit application to identify the hammermills and allow DNR and the public to assess Didion's claim that the hammermills were exempt. PPFOF ¶ 112. Didion's claim was not very credible in the first place: of the five to six ethanol plants with dry milling processes Mr. Faith has served as the air permit engineer for as of Jan. 8, 2008, none of the hammer mills have been considered insignificant sources, and they have all required some sort of emissions controls and limitations. *Id.* ¶ 115.

Didion did not amend its pending operating permit application to include the three new hammermills until June 27, 2008, at the earliest. Yet it was clearly constructing these emission sources as of at least September 4, 2007, when it began construction on the hammermills. PPFOF ¶ 106. Therefore, Didion was in violation of its obligation to truthfully identify all processes and emissions sources at the milling facility per Wis. Admin. Code § 407.05(4) and (10), and its twin obligation to correct its

application per Wis. Admin. Code § 407.05(9) between September 4, 2007, and June 27, 2008. This is a period of **297 days**. Plaintiff moves for summary judgment against Didion as to these days.

In sum, Didion has violated the Wisconsin SIP and Permit 07-DCF-003 by constructing the three new grain hammermills without a construction permit and doing so in a manner inconsistent with its application for Permit 07-DCF-003, and has further violated the Wisconsin SIP by failing to amend its pending operating permit application to identify the three grain hammermills. Plaintiff moves for summary judgment as to **736 days** of violation for the construction permit SIP violation, **736 days** of violation of Permit 07-DCF-003, **736 days** of violation of Wis. Admin. Code § NR 406.10, and **297 days** of violation for the operating permit SIP violation. This totals **2505 days** of violation. For the reasons stated above, this motion should be granted.

    C.    *Didion Failed to Keep Records of Baghouse Operation, and Exceeded Allowable Operating Limits for the Baghouses* (Fourth Cause of Action, 2nd Amend. Compl. (Dkt. 12).

Under Permits 06-DCF-166, 07-DCF-003 and 08-DCF-155, Didion employs fabric filter baghouses to control particulate pollution from various sources at the milling and ethanol plant. PPFOF ¶¶ 125, 127. A baghouse is a series of fabric filter bags housed in a structure. PPFOF ¶ 126. Air containing particulate matter is pulled into the baghouse via a fan and spreads out to the baghouse's various fabric bags. *Id.* Air can pass through the porous fabric, but the solid material suspended in the air cannot. *Id.* This particulate matter is captured in the mesh of the fabric, forming a filter cake on the bag

which is cleaned out periodically. *Id.* Air that has passed through the baghouse is then exhausted out of the process stack. *Id.*

Didion has violated permit conditions that ensure the baghouses are operating properly (and therefore adequately controlling particulate matter), and has failed to keep records related to the baghouses that would indicate compliance. Plaintiffs move for summary judgment on this claim as set forth below.

### 1. Didion Failed to Keep Baghouse Pressure Logs as Required by its Permits and the SIP.

One way Didion assures that the baghouses are operating properly is to monitor and record the pressure drop across the baghouses. PPFOF ¶ 128. The pressure drop represents the amount of friction of the air passing through the fabric filter bags. *Id.* In order to demonstrate compliance with PM and PM10 limits in its permits, several sections of Permits 06-DCF-166 and 07-DCF-003 required Didion to monitor and record the pressure drop across the baghouses every eight hours of operation or once per day, whichever is more often. *Id.* ¶ 130.

Didion was required to maintain a baghouse log pursuant to 13 sections of Permit 06-DCF-166 and 07-DCF-003: Permit 06-DCF-166 §§ I.J.1.c.(2), I.K.1.c.(2), I.L.1.c.(2), I.M.1.c.(2), I.N.1.c.(2), I.O.1.c.(2), I.P.1.c.(2), I.Q.1.c.(2), I.R.1.c.(2), and Permit 07-DCF-003 §§ I.L.1.c.(2), I.M.1.c.(2), I.O.1.c.(2)., I.R' .1.c.(2). PPFOF ¶ 130. The sections of Permits 06-DCF-166 and 07-DCF-003 relating to baghouse pressure monitoring and pressure ranges correspond to the following processes, stacks, and control device (baghouse) numbers:

| Permit Section | Process Number | Stack Number | Control Device number |
|---|---|---|---|
| Permit 06-DCF-166 | | | |
| § I.J., North Truck/Rail Unload and Building Filter, Grain Receiving | P01 | S01 | C01 |
| § I.K., Mill Truck Bulk Loadout Building Filter: Product Loadout | P08 | S08 | C08 |
| § I.L., South Filters: Grain Milling | P10 | S10 | C10 |
| § I.M., North Filters: Grain Milling | P11 | S11 | C11 |
| § I.N., Mill Bins Transfer Filter | P12 | S12 | C12 |
| § I.O., RCPF Hammermill Filter – Grain Milling, Grain Conveyor to Ethanol Plant; Raw Grain Storage Silos; Grain storage and Grain Handling; Product Storage Silos | P14, P22, P23 | S14 | C14 |
| § I.P., South Truck Unload/Loading Building Filter; Grain Receiving | P15 | S17 | C17 |
| § I.Q., Mill Flour Operations Filter – Grain Milling | P19 | S21 | C21 |
| § I.R., Mill/Germ Recovery/Toasting/Grinding Filter- Grain Milling | P21 | S22 | C22 |
| Permit 07-DCF-003 | | | |
| § I.L., South Filters; Grain Milling and Mill Bins | P10, P12S | S10 | C10 |
| § I.M., North Filters; Grain Milling and Mill Bins | P11, P12N | S11 | C11 |
| § I.O., Product Storage (silos) and Transfer | P21, P23 | S14 | C14 |
| § I.R.', Mill/Germ Recovery/Toasting (including two new toasting units)/Grinding Filter/Grain Milling | P20 | S22 | C22 |

PPFOF ¶ 129.

    a.  <u>The December 7, 2006, to January 22, 2008, Baghouse Log.</u>

Didion kept a baghouse log pursuant to Permit 06-DCF-166 and Permit 07-DCF-003 for the period from December 7, 2006 to January 22, 2008.  PPFOF ¶ 131.  Despite the fact that each of the thirteen permit sections identified above required Didion to

keep a log for its respective baghouses, Didion's baghouse log only contains entries for five baghouse filters: "north," "south," "P1," "P2," and "B1."  PPFOF ¶ 132.  As a result, the Dec. 7, 2006 to Jan. 22, 2008 log only contains entries for sources controlled by the following four permit sections:

- Permit 06-DCF-166 § I.J. ("north" filter on log)
- Permit 06-DCF-166 § I.O., Permit 07-DCF-003 § I.O. ("P1" and "P2" filter on log)
- Permit 06-DCF-166 § I.P. ("south" filter on log)

PPFOF ¶ 133.  This means that Didion kept no baghouse logs between December 7, 2006, to January 22, 2008, for sources controlled by the following nine permit sections:

- Permit 06-DCF-166 § I.K.
- Permit 06-DCF-166 § I.L.
- Permit 06-DCF-166 § I.M.
- Permit 06-DCF-166 § I.N.
- Permit 06-DCF-166 § I.Q.
- Permit 06-DCF-166 § I.R.
- Permit 07-DCF-003 § I.L.
- Permit 07-DCF-003 § I.M.
- Permit 07-DCF-003 § I.R.

PPFOF ¶ 134.

From December 7, 2006 (the first day the log was kept), through September 3, 2007 (the day before Permit 07-DCF-003 was issued), a period of **270 days**, Didion violated Permit 06-DCF-166 §§ I.L., I.M., I.N. and I.R because it failed to keep baghouse pressure logs under these sections.  Two sections of Permit 06-DCF-166 (§§ I.K. and I.Q.) did not expire when Permit 07-DCF-003 was issued, PPFOF ¶¶ 36, 40, meaning Didion violated these sections from December 7, 2006 through January 22, 2008, the last day of

the log, a period of **410 days**.  Didion violated Permit 07-DCF-003 §§ I.L., I.M, and I.R. from September 4, 2007, to January 22, 2008, a period of **140 days**.

This translates to 2,320 days of violation as follows:

> 270 days x 4 permit sections = 1080 days of violation
> 410 days x 2 permit sections = 820 days of violation
> 140 days x 3 permit sections = 420 days of violation
>
> Total     = **2,320 days of violation**

Furthermore, for those entries that were recorded in the December 7, 2006, to January 22, 2008, baghouse log, the log reflects that during that time, Didion failed to record the pressure drop from the baghouses on **twenty-one (21) days** where the records indicate the connected processes were running.  PPFOF ¶ 135.

b.  <u>The February 29, 2008, to August 19, 2009, Baghouse Log.</u>

Didion kept a baghouse log pursuant to Permit 06-DCF-166 and Permit 07-DCF-003 for the period from February 29, 2008, to August 19, 2009.  PPFOF ¶ 136.  This log only contains entries for five baghouse filters: "north," "south," "bin 7," "bin 9," and occasionally, "bin 1."  PPFOF ¶ 137.  Consequently, the February 29, 2008, to August 19, 2009, log only contains entries for the following permit sections:

- Permit 06-DCF-166 § I.J. ("north" filter on log)
- Permit 06-DCF-166 § I.O., Permit 07-DCF-003 § I.O. ("bin 7" and "bin 9" filter on log)
- Permit 06-DCF-166 § I.P. ("south" filter on log)

PPFOF ¶ 138.  Didion kept no baghouse logs between February 29, 2008, to August 19, 2009, a period of 172 days, for the following 5 permit sections:

- Permit 06-DCF-166 § I.K.
- Permit 06-DCF-166 § I.Q.

30

- Permit 07-DCF-003 § I.L.
- Permit 07-DCF-003 § I.M.
- Permit 07-DCF-003 § I.R.

PPFOF ¶ 139.  This amounts to **860 days of violation** (172 days x 5 permit sections) for failed recordkeeping.  From January 23, 2008 to February 28, 2008, a period of 37 days, Didion kept no baghouse logs at all pursuant to Permit 06-DCF-166 §§ I.K.1.c.(2), I.Q.1.c.(2), and Permit 07-DCF-003 §§ I.L.1.c.(2), I.M.1.c.(2), I.R' .1.c.(2).  PPFOF ¶ 140. This amounts to **185 days of violation** (37 days x 5 permit sections).

The DNR has agreed with Plaintiffs' assessment of Didion's recordkeeping. On May 15, 2008, DNR issued Didion a notice of violation for failing to record baghouse pressure drops between October 2006 and February 2008, and for operating outside the permitted 2-5" range during the same time period.  The notice stated the violations met the criteria for high priority violations.  PPFOF ¶ 144.

Thus, under Permits 06-DCF-166 and 07-DCF-003, Didion recorded **3,386** days of violations because it failed to properly keep baghouse records under the permit sections identified above.  Didion also violated each permit's prohibition on failing to operate the milling and ethanol facility contrary to the permitted conditions.  PPFOF ¶ 177. These permit violations are in turn a violation of the Wisconsin SIP at Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code § NR 406.10, which require an air pollution source to comply with a construction permit.

Plaintiffs thus move for summary judgment for Didion's 3,386 days of permit

violations, and 3,386 days that it violated the Wisconsin SIP, for a total of **6,772 days** of violation.

### 2. Didion Operated the Baghouse Outside of Allowable Limits in Violation of its Permits and the SIP.

In order to demonstrate compliance with PM and PM10 limits under Permits 06-DCF-166 §§ I.J.1.b.(3), I.J.1.c.(2), I.K.1.b.(3), I.K.1.c.(2), I.L.1.b.(3), I.L.1.c.(2), I.M.1.b.(3), I.M.1.c.(2), I.N.1.b.(3), I.N.1.c.(2), I.O.1.b.(3), I.O.1.c.(2), I.P.1.b.(3), I.P.1.c.(2)and 07-DCF-003 §§ I.L.1.b.(3), I.L.1.c.(2), I.M.1.b.(3), I.M.1.c.(2), I.O.1.b.(3), I.O.1.c.(2), Didion was required to maintain baghouse pressure measured at  two (2) to five (5) inches of water column.  PPFOF ¶ 141.

As reflected in the baghouse pressure logs Didion did keep, Didion reported multiple violations of the 2 to 5 inch range of water column.  For the period from December 7, 2006 to January 22, 2008, the pressure drop on the baghouses was outside the required 2 to 5 inches of water column on 83 occasions over **76 days**.  PPFOF ¶ 142. For the period between February 29, 2008 through May 27, 2009, the pressure drop was outside the required two (2) to (5) inches of water on 125 occasions over **78 days**. PPFOF ¶ 143.  This totals **154 days** of violation of the permits.  Didion also violated each permit's prohibition on operating the milling and ethanol facility contrary to the permitted conditions.  PPFOF ¶ 177.   These permit violations are in turn a violation of the Wisconsin SIP at Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code § NR 406.10, which require an air pollution source to comply with a construction permit.

32

The DNR has issued Didion two notices of violation because it has operated the baghouses outside of the acceptable 2 to 5 inch range: one on May 15, 2008, and another on July 22, 2009.  PPFOF ¶ 144.  Both times, the DNR identified the violations as high priority violations.  *Id.*

Plaintiffs thus move for summary judgment against Didion for the 154 days it violated its permits' requirements to operate the baghouses within the appropriate pressure range, and the 154 days it violated the Wisconsin SIP for failing to operate according to its permits, Wis. Admin. Code § NR 406.10, for a total of **308 days** of violation.  Combined with the **6,772** days of violation for failed recordkeeping, the total days of baghouse-related violations is **7,080**.

        D.     *Didion Emitted Particulate Matter from the Grain Dryer in Violation of Permit 07-DCF-003 and the Wisconsin SIP.* (Sixth Cause of Action, 2nd Amend. Compl. (Dkt. 12).

As noted above, DNR may impose conditions in any air pollution control permit to ensure compliance the SIP and the CAA.  These conditions can include requirements necessary to assure compliance with ambient air standards and air increment.  Wis. Stat. §§ 285.63, .65(3).  Didion needed such limits to achieve ambient air quality standards for particulate matter from its grain dryer, but then violated those limits under Permit 07-DCF-003 and the Wisconsin SIP.  Plaintiffs accordingly move for summary judgment on this claim as stated below.

The milling plant includes a grain dryer (process 16, discharging through stack 23) that is a source of PM and PM10.  PPFOF ¶¶ 146-148.  In the permitting process for

Permit 07-DCF-003, Didion elected emission limits on the grain dryer in order to attain and maintain the ambient air quality standard for PM and PM10, to attain and maintain compliance with PSD increment,[4] and to ensure that the entire facility remained a minor source for Part 70 and PSD purposes.   PPFOF ¶ 150.  These limits were as follows: "(1) The emissions may not exceed **6.96 lb/hr of PM** and **1.74 lb/hr of PM₁₀** from S23. [s. NR 404.08(2), and s. NR 415.05(2), Wis. Adm. Code; s. 285.65(3), Wis. Stats.]."  PPFOF ¶ 149 (quoting Permit 07-DCF-003 § I.S''.1.a.(1) (emphasis added)).  The permit cited two administrative code sections to further support these limits: Wis. Admin. Code § NR 415.05(2), which establishes acceptable PM limits for direct sources based on source-specific inputs, and Wis. Admin. Code § NR 404.08(2), which allows the DNR to require more restrict emission limits where emissions cause or substantially contribute to exceeding an air standard in a localized area.  Permit 07-DCF-003 § I.S''.1.b.(5) also required Didion to conduct stack testing of the Grain Dryer to ensure compliance with the PM10 emission limits within 90 days of enclosing the grain dryer in a stack, which occurred on September 24, 2007.  PPFOF ¶¶ 151-152.

Didion has twice stack tested its grain dryer, and has twice shown violations of the emission limits in Permit 07-DCF-003.  On January 3-4, 2008, Didion conducted stack testing of the grain dryer at the milling plant.  PPFOF ¶ 153.  Didion conducted three testing runs, which showed an average of **15.52 lbs/hour of PM**—more than twice the permitted level of 6.96 lbs/hour.  PPFOF ¶ 158.  On November 19, 2008, Didion re-

---

[4] Attaining and maintaining compliance with these standards is a precondition of receiving a permit.  Wis. Stat. § 285.63(1)(b).

tested the grain dryer. PPFOF ¶ 160. This time, the stack tests showed Didion was

violating both the PM and the PM10 emission limits in Permit 07-DCF-003: the average

of Didion's first two runs measured emissions from the grain dryer at a staggering

**23.373 lbs/hour for PM** and **7.18 lbs/hour of PM10**, four times the permitted level for

each pollutant. PPFOF ¶¶ 163-64. Runs 3-5 measured PM emissions from the grain

dryer as **21.58 lbs/hour of PM** (approximately 3 times the permitted limit) and **7.32**

**pounds/hour of PM10** (over 4 times the permitted limit). PPFOF ¶¶ 168-69.

On April 14, 2008, DNR issued a Notice of Violation to Didion for violations of

Permit 07-DCF-003, Wis. Stat. ch. 285, and Wis. Admin. Code ch. NR 415 for the

exceedences recorded in the Jan. 3-4, 2008, stack test. PPFOF ¶ 159. On July 22, 2009,

DNR issued another Notice of Violation to Didion for, *inter alia*, the PM and PM10

exceedences recorded in the November 19, 2008 grain dryer stack testing. *Id.* ¶ 170.

Due to the seriousness of the violations, DNR scheduled an enforcement conference

with Didion on the matter and notified Didion that the violations met the criteria for

High Priority Violations. *Id.*

Didion has clearly violated the emission limits for PM and PM10 in Permit 07-

DCF-003 § I.S''.1.a.(1), sometimes at levels that quadrupled the emission limits in the

permit. These limits were necessary to show compliance with the CAA and multiple

provisions of the Wisconsin SIP, including Wis. Admin. Code § 415.05(2). PPFOF ¶¶

149-150. By violating the prescribed emission limits in the permit, Didion also violated

Permit § 07-DCF-003 §§ II.L., which required Didion to operate in accordance with all

permit conditions.  Didion's violation of its permit is also a violation of the following

provisions of the Wisconsin SIP: Wis. Stat. § 285.60(7) and Wis. Admin. Code § NR

406.10, which require compliance with all permit terms and conditions, and Wis.

Admin. Code § 415.05(2), which establishes acceptable limits of PM for direct sources.

Pursuant to 42 U.S.C. § 7413(e)(2), "a penalty may be assessed for each day of

violation." The Act further provides,

> For purposes of determining the number of days of violation for
> which a penalty may be assessed under . . . section 7604(a) of this title . . .
> where the Administrator or an air pollution control agency has notified
> the source of the violation, and the plaintiff makes a prima facie showing
> that the conduct or events giving rise to the violation are likely to have
> continued or recurred past the date of notice, **the days of violation shall
> be presumed to include the date of such notice and each and every day
> thereafter** until the violator establishes that continuous compliance has
> been achieved, except to the extent that the violator can prove by a
> preponderance of the evidence that there were intervening days during
> which no violation occurred or that the violation was not continuing in
> nature.

42 U.S.C. § 7413(e)(2).

As noted above, Didion received notice from DNR—an air pollution control

agency pursuant to 42 U.S.C. § 7413(e)(2)—that it was violating the terms of Permit 07-

DCF-003, Wis. Stat. ch. 285, and Wis. Admin. Code ch. 415 due to the excess emissions

from the Grain Dryer.  PPFOF ¶ 159.  These violations continued—and worsened—as

shown by the subsequent November 19, 2008, stack test.  PPFOF ¶¶ 160-168.  Thus,

pursuant to 42 U.S.C. § 7413(e)(2), Didion has been in violation of Permit 07-DCF-003

and the Wisconsin SIP from April 14, 2008, the date of the DNR notice, through

September 9, 2009, when it obtained Permit 08-DCF-155.  PPFOF ¶¶ 171.[5]  This is **513 days** of violation of the permit, **513 days** of violation of the SIP's prohibition on permit violations, Wis. Stat. § 285.60(7), Wis. Admin. Code § NR 406.10, and **513 days** of violation of Wis. Admin. Code § 415.05(2), a total of **1,539 days** of violation.

Notably, this is not the first time Didion has violated permit limits on its grain dryer.  As this Court found, Didion violated limits on the hours of operation for its grain dryer multiple times in late 2006.  *CTD v. Didion*, 571 F. Supp. 2d. at 976.

Plaintiff accordingly moves the Court for **<u>1,539 days</u>** of violation related to Didion's illegal grain dryer operations.

E.    *Didion Submitted a False Certification of Compliance with the DNR In Violation of the Wisconsin SIP* (Eighth Cause of Action, 2nd Amend. Compl. (Dkt. 12)).

Wis. Admin. Code § 407.05(10) states that "[a]ll material statements, representations, and certifications in a permit application shall be truthful." Wis. Admin. Code § 407.05(9) further states that "[a]n applicant who has failed to submit relevant facts or has submitted incorrect information in a permit application shall, after becoming aware of this fact, promptly submit the supplemental or corrected information."  "Certificates of compliance are not taken lightly.  Filing a false compliance certification exposes the responsible corporate official and/or the source to

---

[5] While Permit 08-DCF-155 prohibits operation of the grain dryer, on November 18, 2009, Didion obtained a temporary waiver allowing it to operate the grain dryer, has in fact operated the grain dryer, and intends to submit a new construction permit application addressing long-term operation of the grain dryer.  PPFOF ¶¶ 171.

potential criminal sanctions, among other things." *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 679 & n.8 (7th Cir. 2008) (citing 42 U.S.C. § 7413(c)).

On June 27, 2008, Didion applied for a significant construction permit revision and an operating permit. PPFOF ¶ 41. As part of that application, Dow Didion signed a certification stating that the Didion milling and ethanol facility were "fully in compliance with all applicable requirements." PPFOF ¶ 172. But as the preceding has shown, Didion was not "fully in compliance with all applicable requirements" on or after June 27, 2008. It was violating the ambient air standard for TSP, still had unpermitted grain hammermills, was not keeping adequate pressure drop records for the baghouses and was recording exceedences when it did, and was emitting excessive levels of emissions from the grain dryer. *E.g.*, PPFOF ¶¶ 92-100, 106-108, 143, 158, 168. The signed compliance certification was accordingly incorrect.

Didion violated the Wisconsin SIP at Wis. Admin. Code §§ NR 407.05(9) and (10) on **June 27, 2008**, when it submitted the false compliance certification to DNR, and Plaintiffs move for summary judgment as to this date.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion for partial summary judgment for 12,140 days of violation as described above, and determine the appropriate penalty for these violation at trial.

38

Dated this 4th day of December, 2009.

Respectfully submitted

MCGILLIVRAY WESTERBERG & BENDER LLC

Attorneys for Plaintiffs


/s/ Christa Westerberg

Christa Westerberg
Wis. Bar No. 1040530
westerberg@mwbattorneys.com
David C. Bender
Wis. Bar No. 1046102
bender@mwbattorneys.com

305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561