# GARVEY McNEIL &
# McGILLIVRAY, S.C.

### ATTORNEYS AT LAW

Edward R. Garvey
Kathleen G. McNeil
Pamela R. McGillivray
Christa O. Westerberg
David C. Bender
Carlos A. Pabellon

Of Counsel:
Peter E. McKeever

February 18, 2008

**VIA CERTIFIED MAIL, RETURN RECIEPT REQUESTED**

Owner or Managing Agent
Didion Milling, Inc.
a/k/a Grand River Distributing
a/k/a Didion Ethanol
501 South Williams Street
Cambria, WI 53923

John A. Didion, Registered
Agent
Didion Ethanol, LLC
520 Hartwig Blvd.
P.O. Box 400
Johnson Creek, WI 53038

Dow Didion
Didion Milling, Inc.
501 South William Street
Cambria, WI 53923

John A. Didion, Registered
Agent
Grand River Distributing, LLC
520 Hartwig Blvd.
P.O. Box 400
Johnson Creek, WI 53038

John A. Didion, Registered Agent
Didion Milling, Inc.
520 Hartwig Blvd.
P.O. Box 400
Johnson Creek, WI 53038

Re:   **Notice of Intent to Sue**

To Those Listed Above:

This letter puts you on notice, pursuant to 42 U.S.C. § 7604(b) and 40

C.F.R. part 54, that Cambrians for Thoughtful Development, U.A., and certain

individuals listed below intend to file a Clean Air Act lawsuit against you,

including the responsible persons in their individual capacities, in the U.S.

District Court for the Western District of Wisconsin, or any other court with

jurisdiction, for violations of the Clean Air Act at your facility located at or about

501 South Williamson Street, Cambria, Columbia County, Wisconsin ("the

Plant").

The persons giving this notice are:

Cambrians for Thoughtful Development, U.A.
c/o John Mueller
307 Mary Street
Cambria, WI 53923
(920) 348-6118

John Mueller
307 Mary Street
Cambria, WI 53923
(920) 348-6118

Tom Jansma
W1897 Cabbage Rd.
Cambria, WI 53923
(920) 348-5266

Mary Jansma
W1897 Cabbage Rd.
Cambria, WI 53923
(920) 348-5266

Leonore Neumann
109 East Commerce Street
Cambria 53923
920-348-6531

(hereinafter, together as "Cambrians")  Although this information is provided

pursuant to 40 C.F.R. pt. 54, you are requested to discuss the subject matter of

this notice with the undersigned legal counsel for Cambrians.

## STATUTORY AND REGULATORY BACKGROUND

1.     The objective of the federal Clean Air Act is "to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  CAA § 101(b), 42 U.S.C. § 7401(b).

2.     The United States Environmental Protection Agency (US EPA) has established National Ambient Air Quality Standards ("NAAQS") for "criteria pollutants," including sulfur dioxide ($SO_2$), nitrogen oxide (NOx), ozone, particulate matter smaller than ten microns (PM10), particulate matter smaller than 2.5 microns (PM2.5), lead and carbon monoxide (CO).  42 U.S.C. § 7602(e); 40 C.F.R. part 50.  Areas where the ambient air meets the NAAQS are designated as "attainment" areas.  42 U.S.C. § 7407(d).  Areas where the ambient air does not meet the NAAQS for a particular criteria pollutant, or areas that contribute to the ambient quality in downwind areas not meeting the NAAQS, are designated "nonattainment" for that pollutant.  Id.

3.     States are required to adopt plans to implement the federal Clean Air Act.  42 U.S.C. § 7410(a).  These plans, called State Implementation Plans or "SIPs," contain enforceable regulations that are designed, among other things, to prevent degradation of air quality in attainment areas and to clean up the air in nonattainment areas.

4.      Pursuant to the Act, each state is required to submit a proposed SIP to US EPA, and if the proposed SIP satisfies the requirements of the Act, it is approved by US EPA through federal notice and comment rule making.  Once a state's SIP is approved by US EPA, it is published in the Code of Federal Regulations and can be enforced by the state, US EPA, or citizens.

5.      Wisconsin has a US EPA approved SIP.  See 40 C.F.R. § 52.2569, *et seq.*

6.      Among the provisions contained in the Wisconsin SIP are Wis. Admin. Code chs. NR 405, NR 406, NR 407 and NR 439.

7.      Under the SIP, the Wisconsin Department of Natural Resources ("DNR") may impose conditions on any air pollution control permit.  Wis. Stat. § 285.65[1].

8.      Conditions the DNR may impose in an air pollution control permit include monitoring, record-keeping, reporting, and compliance certification requirements, Wis. Stat. § 285.65(10), and requirements to submit compliance plans and schedules and progress reports, *id.* § 286.65(11).

9.      Violating an air pollution control permit and any conditions it contains is a violation of the Wisconsin SIP.  Wis. Stat. § 285.60 and (7); Wis. Admin. Code § NR 406.10.

10.    DNR regulations implementing the Wisconsin SIP contain

---

[1] The relevant sections of Wis. Stat. ch. 285 cited herein are incorporated into the Wisconsin SIP under their prior section numbers (Wis. Stat. ch. 144).  This notice letter refers to the SIP provisions according to their current statutory section for your reference.

separate monitoring and record-keeping requirements, including Wis. Admin. Code §§ NR 439.03(12), which prohibits any person from rendering any monitoring method required by any permit inaccurate; NR 439.04(1), which requires the permittee to maintain records of all monitoring required by any permit; NR 439.04(2), which requires the permittee to maintain records required by any permit for at least 5 years; and NR 439.10, which prohibits the use of any method to conceal actual emissions.

11.   The Wisconsin SIP includes Wis. Stat. § 285.60(1)(a)1. and Wis. Admin. Code §§ NR 406.03 and NR 406.10, which require an air pollution source to obtain and comply with a construction permit when the source is modified.

12.   It is also a violation of the SIP to "fail[] to construct a stationary source in accordance with the application as approved by the [Wisconsin Department of Natural Resources]" and/or to "fail[] to construct and operate a stationary source in accordance with conditions imposed" by DNR. Wis. Admin. Code § NR 406.10.

13.   Another important component of the Clean Air Act is the Prevention of Significant Deterioration program ("PSD program"). This program is applicable in attainment or unclassified areas and is designed to do as its name suggests: prevent new or modified sources of air pollution from causing the significant deterioration of air quality.

14.    The PSD program requires that prior to constructing or modifying a major source of air pollution, the owner or operator must obtain a permit that ensures that NAAQS and air pollution increments are protected.  This includes pollution limits based on modern pollution controls, otherwise known as Best Available Control Technology (BACT).  Wis. Admin. Code §§ NR 405.01(1), 405.07(1).

15.    Wisconsin's SIP includes a PSD program.  See Wis. Admin. Code ch. NR 405; 40 C.F.R. § 52.2569, et seq.  Owners or operators of major pollution sources must obtain a permit from the Wisconsin Department of Natural Resources ("DNR") before commencing construction or modifying the source. Id.

16.    Didion Milling, Inc. ("DMI") has operated a grain mill in the Village of Cambria, Wisconsin, for approximately 17 years.

17.    The Plant is a source of particulate matter pollution emissions. Particulate air pollution is a significant health and welfare threat.

18.    DMI was issued permit number 02-RV-166 for the Plant on May 12, 2005.  This permit was valid until November 12, 2006.  The permit was later extended to May 12, 2008, but was superseded by permit 06-DCF-166, which was issued on October 19, 2006.

19.    DMI was issued permit 07-DCF-003 on September 4, 2007.

## VIOLATIONS AT DIDION MILLING

20.    Permits 02-RV-166, 06-DCF-166 and 07-DCF-003 all required DMI to monitor, record, and report total suspended particulate matter concentrations in the ambient air.

21.    Permit 02-RV-166 § I.Q required the monitor to be operated for no fewer than 36 months, that Didion report to the Wisconsin Department of Natural Resources within 15 days of any exceedances of the 24-hour standard for total suspended particulate matter (150 microns per cubic meter), and for each exceedance, provide the wind speed, wind direction, and activities occurring at the Didion plant.

22.    06-DCF-166 § I.V includes the same requirement, which was extended for 36 months from the date of the permit issuance, or 24 months after operation of the ethanol plant emission sources being constructed, whichever is later.

23.    07-DCF-003 § I.U. contains a similar requirement as Permit 06-DCF-166 § V.

24.    Sections II.B and II.C.1 of Permits 02-RV-166, 06-DCF-166, and 07-DCF-003 prohibit DMI from causing an exceedance of, *inter alia*, the air quality standard in Wis. Admin. Code § NR 404.04(3).

25.    Moreover, Wis. Admin. Code § NR 415.03, which is also included in the Wisconsin SIP, prohibits "caus[ing], allow[ing] or permit[ing] particulate

Clean Air Act Notice of Intent to Sue
Page 8 of 24
February 18, 2008

matter to be emitted into the ambient air which substantially contributes to exceeding of an air standard, or creates air pollution."

26.    Additionally, every violation of any permit condition also constitutes a violation of Wis. Stat. § 285.60, Wis. Admin. Code § NR 406.10, and section II.L of each of DMI's permits (02-RV-66, 06-DCF-166, 07-DCF-003), which require compliance with each permit term and condition.

27.    DMI claims to have stopped collecting air quality monitoring samples for particulate matter in June, 2007.

28.    Before DMI stopped reporting air quality monitoring samples to the DNR, DMI recorded many days where the ambient air concentration of total particulate matter exceeded the air quality standard in Wis. Admin. Code ch. NR 404.  These days include the following:

    a)  April 30, 2007;

    b)  May 3, 2007;

    c)  May 18, 2007;

    d)  May 24, 2007;

    e)  May 30, 2007;

    f)  June 11, 2007;

    g)  June 13, 2007; and

    h)  June 29, 2007.

29.    The particulate matter in the air on the days identified above consisted largely of grain and corn attributable to DMI.

30.    On the dates identified above, and likely on other dates, DMI caused and/or contributed to a violation of the air quality standard for total particulate matter in Wis. Admin. Code § NR 404.04(3).  On many of these dates, the measured concentrations were significantly in excess of the air standard.  In fact, at least one DNR enforcement official has characterized these exceedances as "egregious."

31.    This notice includes every day on which there is evidence that ambient air concentrations of total suspended particulate matter exceeded 150 micrograms per cubic meter and when any portion of that total suspended particulate matter contained evidence of corn or grain.  Because DMI failed to report all monitoring results, these dates are known to DMI, but may not be known yet to the Wisconsin DNR or the public.

32.    Each and every day on which DMI caused or contributed to a violation of air quality standards, including those dates identified above, constitutes a violation of the following:

    a)  Section II.B. of each of DMI's permits;

    b)  Section II.C. of each of DMI's permit;

    c)  Section I.Y.4. of Permit 06-DCF-166;

    d)  Section I.ZZZ.3 of Permit 07-DCF-003;

e)  Section II.L. of each of DMI's permits;

f)  Wis. Admin. Code § NR 406.10;

g)  Wis. Admin. Code § NR 415.03; and

h)  Wis. Stat. § 285.60.

33.    Each and every day that DMI failed to collect and report air quality

monitoring results constitutes a violation of the following:

a)  Permit 02-RV-166 § I.Q;

b)  Permit 06-DCF-166 § I.V;

c)  Permit 07-DCF-003 § I.U;

d)  Section I.Y.4. of Permit 06-DCF-166;

e)  Section I.ZZZ.3 of Permit 07-DCF-003;

f)  Section II.L. of each of the permits;

g)  Wis. Admin. Code § NR 406.10;

h)  Wis. Admin. Code § NR 439.03(12);

i)  Wis. Admin. Code § NR 439.04(1);

j)  Wis. Admin. Code§ NR 439.04(2);

k)  Wis. Admin. Code § NR 439.10; and

l)  Wis. Stat. § 285.60.

34.    Section II.H. of DMI's permits (02-RV-166, 06-DCF-166, 07-DCF-003)

also prohibits "construction, reconstruction, replacement, relocation or

modification of a stationary source unless the person has a construction permit

for the source or unless the source is exempt from the requirement to obtain a permit…"

35.   DMI constructed grain hammermills on the site of the new ethanol plant emission source (Town of Courtland).  Those hammermills are not authorized by any permit issued by the DNR and are not exempt from the requirement to obtain a permit.

36.   The potential to emit from the hammermills, as defined in Wis. Admin. Code § NR 405.02(25), is greater than three tons of particulate matter per year.  When these emissions are added to the potential to emit of the other processes at DMI, the plant constitutes a major stationary source subject to Prevention of Significant Deterioration ("PSD") under the Clean Air Act.  42 U.S.C. § 7470, *et seq.*  <u>See</u> Wis. Admin. Code § NR 405.02(22)(a)1.

37.   As a major stationary source under PSD, DMI must comply with best available control technology ("BACT") for particulate matter, must comply with pre-construction review, must submit preconstruction monitoring, and must submit pre-construction impact analyses, among other requirements.  42 U.S.C. § 7475; Wis. Admin. Code §§ NR 405.07- NR 405.16.

38.   Pursuant to the Clean Air Act, and as further clarified by the U.S. Environmental Protection Agency, a facility such as DMI's plant that becomes a major stationary source under PSD must comply with the requirements of PSD, including BACT, regardless of whether it subsequently applies for a synthetic

minor permit.  See Memorandum from Eric V. Schaeffer, Director of Office of

Regulatory Enforcement, USEPA Re: Guidance on the Appropriate Injunctive

Relief for Violations of Major New Source Review Requirements (Nov. 17, 1998).

39.    Additionally, with the addition of the hammermills that are not

permitted by any existing permit for DMI, the plant constitutes a "major source"

under Wis. Admin. Code ch. NR 407 and 42 U.S.C. § 7661(2).  Therefore, DMI

was required to apply for a permit pursuant to Clean Air Act Title V, 42 U.S.C. §

7661, et seq.  DMI has not applied for this permit.

40.    Moreover, DMI did not identify the hammermills in any of its permit

applications, did not identify its source as a major source, and has not corrected

these misrepresentations or omissions, as required by Wis. Admin. Code §§ NR

407.05(4), (9) and (10).

41.    DMI specifically told the DNR, during the application process

preceding permits 06-DCF-166 and 07-DCF-003, that DMI would not construct

hammermills on site of the ethanol plant in the Town of Courtland.

42.    By constructing the hammermills on the site of the new ethanol plant

in the Town of Courtland, contrary to the application submitted to DNR, and

unauthorized by any permit issued by DNR, DMI violated the following:

a)  42 U.S.C. § 7475;

b)  42 U.S.C. § 7661a(a);

c)  Wis. Admin. Code §§ NR 407.05(4), (9), and (10);

d) Wis. Admin. Code § NR 406.10;

e) Wis. Admin. Code § NR 405.07;

f) Wis. Admin. Code § NR 405.08;

g) Wis. Admin. Code § NR 405.09;

h) Wis. Admin. Code § NR 405.11;

i) Wis. Admin. Code § NR 405.13;

j) Wis. Stat. § 285.60;

k) Section I.Y.4. of Permit 06-DCF-166;

l) Section I.ZZZ.3 of Permit 07-DCF-003;

m) Section II.L. of each of DMI's permits; and

n) Section II.H of each of DMI's permits.

43.     Permit 06-DCF-166 and 07-DCF-003 also require DMI to monitor

and record the pressure drop across the baghouses every eight (8) hours or once

per day, whichever is more often.  Permit 06-DCF-166 §§ I.J.1.c.(2), I.K.1.c.(2),

I.L.1.c.(2), I.M.1.c.(2), I.N.1.c.(2), I.O.1.c.(2), I.P.1.c.(2), I.Q.1.c.(2), I.R.1.c.(2), and

Permit 07-DCF-003 §§ I.L.1.c.(2), I.M.1.c.(2), I.O.1.c.(2)., I.R'.1.c.(2).

44.     Pursuant to Wis. Admin. Code §§ NR 439.04, NR 439.055(1)(a) and

(2), DMI is also required to monitor and record the pressure drop across each

baghouse at least every 8 hours.

45. DMI failed to record the pressure drop from the baghouses on a number of days where the records indicate the connected processes were on, including:

a) December 26, 2006 ("P1 Filter"),

b) January 5, 2007 ("B7 Filter" and "B9 Filter"),

c) January 8, 2007 ("B7 Filter" and "B9 Filter"),

d) January 9, 2007 (same),

e) January 10, 2007 (same),

f) January 11, 2007 (same),

g) January 12, 2007 ("B9 Filter"),

h) January 31, 2007 ("B9 Filter"),

i) February 1, 2007 (same),

j) February 2, 2007 (same),

k) February 5, 2007 (same),

l) February 6, 2007 (same),

m) February 7, 2007 (same),

n) February 8, 2007 ("B7 Filter"),

o) February 9, 2007 (same),

p) February 12, 2007 (same),

q) February 13, 2007 (same),

r) February 14, 2007 (same),

s)  February 15, 2007 (same),

t)  February 19, 2007 (same),

u)  August 23, 2007 ("B7"),

v)  August 24, 2007 ("B1" and "B9"),

w)  August 27, 2007 (same),

x)  August 28, 2007 (same),

y)  September 18, 2007 ("South" filter), and

z)  November 15, 2007 ("South" filter).

46.  The dates on which pressure drop was not recorded, set forth above, does not include the many days on which there is no entry in the baghouse records.  For example, there are no entries between March 22, 2007 and March 28, 2007, or between July 19 and July 23, 2007.  This notice includes all dates on which DMI operated processes connected to a baghouse and failed to record baghouse pressure drop.

47.  Each day that DMI failed to record the pressure drop across a baghouse while the process or processes connected to the baghouse were operating constitutes a separate violation of:

a)  Permit 06-DCF-166 §§ I.J.1.c.(2), I.K.1.c.(2), I.L.1.c.(2), I.M.1.c.(2), I.N.1.c.(2), I.O.1.c.(2), I.P.1.c.(2), I.Q.1.c.(2), and/or I.R.1.c.(2);

b)  Permit 07-DCF-003 §§ I.L.1.c.(2), I.M.1.c.(2), I.O.1.c.(2)., and/or I.R'.1.c.(2).

c)   Section I.Y.4. of Permit 06-DCF-166;

d)   Section I.ZZZ.3 of Permit 07-DCF-003;

e)   Section II.L. of each permit;

f)   Wis. Admin. Code § NR 406.10;

g)   Wis. Admin. Code § NR 439.03(12);

h)   Wis. Admin. Code § NR 439.04(1);

i)   Wis. Admin. Code§ NR 439.04(2);

j)   Wis. Admin. Code § NR 439.055;

k)   Wis. Admin. Code § NR 439.10; and

l)   Wis. Stat. § 285.60.

48.     Under Permits 06-DCF-166 and 07-DCF-003, all emission sources at the DMI milling plant that are required to be directed to a baghouse include the same requirement to maintain baghouse pressure between two (2) and five (5) inches of water and to record the pressure drop at least every 8 hours.  Permit 06-DCF-166 §§ I.J.1.b.(3), I.J.1.c.(2), I.K.1.b.(3), I.K.1.c.(2), I.L.1.b.(3), I.L.1.c.(2), I.M.1.b.(3), I.M.1.c.(2), I.N.1.b.(3), I.N.1.c.(2), I.O.1.b.(3), I.O.1.c.(2), I.P.1.b.(3), I.P.1.c.(2); Permit 07-DCF-003 §§ I.L.1.b.(3), I.L.1.c.(2), I.M.1.b.(3), I.M.1.c.(2), I.O.1.b.(3), I.O.1.c.(2).

49.     On many days, the pressure drop across the baghouse was outside of the required two (2) to five (5) inches of water, including:

a)       January 14, 2007 ("B9 Filter" recorded 0.0 (zero)),

b)      January 15, 2007 (same),

c)      January 17, 2007 (same),

d)      January 18, 2007 (same),

e)      January 19, 2007 (same),

f)      January 22, 2007 (same),

g)      January 23, 2007 (same),

h)      January 24, 2007 (same),

i)      January 25, 2007 (same),

j)      January 26, 2007 (same),

k)      January 29, 2007 (same),

l)      January 30, 2007 ("B9" recorded "Calibrate" rather than a

        pressure drop),

m)      March 22, 2007 ("B7 Filter" recorded "0.3" pressure drop),

n)      March 30, 2007 ("B9" recorded 0.0 (zero) pressure drop),

o)      April 2, 2007 (same),

p)      April 3, 2007 (same),

q)      April 4, 2007 (same),

r)      April 5, 2007 (same),

s)      April 6, 2007 (same),

t)      April 9, 2007 (same),

u)      April 10, 2007 (same),

v)     April 11, 2007 (same),

w)     April 12, 2007 (same),

x)     April 13, 2007 (same),

y)     April 16, 2007 (same),

z)     April 17, 2007 (same),

aa)    April 18, 2007 (same),

bb)    July 14, 2007 ("B1 Filter" recorded 0 (zero) pressure, "South

Filter" recorded 7.0 pressure, and "B9 Filter" recorded 1.0

pressure),

cc)    August 3, 2007 ("7" recorded 1.0 pressure drop),

dd)    August 16, 2007 "B7" recorded 0.1 pressure drop),

ee)    August 29, 2007 ("B1" recorded 0.1 pressure drop),

ff)    September 10, 2007 ("B9" recorded 0 (zero) pressure drop),

gg)    September 14, 2007 (same),

hh)    September 17, 2007 ("B9" recorded "0 still" as the pressure

drop),

ii)    September 18, 2007 ("B9" recorded 0 (zero) pressure drop),

jj)    September 19, 2007 ("B9" recorded "0 Needs work" as the

pressure drop),

kk)    September 20, 2007 (same),

ll)    October 4, 2007 (same),

mm) October 17, 2007 ("B1" recorded 15.0 pressure),

nn) October 18, 2007 ("South" recorded 14 as the pressure),

oo) October 22, 2007 ("South" recorded 0 (zero) as the pressure),

pp) October 23, 2007 (same),

qq) October 24, 2007 ("B7" recorded 0 (zero) pressure and also

recorded "Keep a [sic] eye on this one"),

rr) October 25, 2007 ("South" recorded 8.3 as pressure; "B7"

recorded 0 (zero) pressure and "Still not working"),

ss) September 29, 2007 ("B7" recorded 0 (zero) pressure),

tt) November 1, 2007 ("South" recorded 9.4 pressure),

uu) November 2, 2007 ("South" recorded 7.0 pressure),

vv) November 6, 2007 ("South" recorded 6.1 pressure and "B7"

recorded 0 (zero) pressure and "not working"),

ww) November 7, 2007 ("South" recorded 8.5 pressure),

xx) November 8, 2007 ("South" recorded 0 (zero) pressure),

yy) November 14, 2007 ("South" recorded 6.0 pressure),

zz) November 16, 2007 (same),

aaa) November 19, 2007 (same),

bbb) November 20, 2007 (same),

ccc) November 21, 2007 ("B7" recorded 1.0 pressure),

ddd) November 26, 2007 ("South" recorded 10 as the pressure),

eee)     November 29, 2007 ("B7" recorded 1.5 as the pressure),

fff)     November 30, 2007 (same),

ggg)     December 3, 2007 (same),

hhh)     December 4, 2007 ("B7" recorded 1.0 pressure, and "South"

recorded 10.0 pressure),

iii)     December 5, 2007 ("South" recorded 9.00 pressure),

jjj)     December 6, 2007 ("B7" recorded 1.5 pressure),

kkk)     December 7, 2007 ("Sout[h]" recorded 9 as the pressure),

lll)     December 10, 2007 ("B9" recorded 1.5 and "South" recorded

6.0 pressure),

mmm)   December 11, 2007 ("B9" recorded 1.5 pressure),

nnn)     December 12, 2007 ("B9" recorded 1.5 pressure),

ooo)     December 14, 2007 ("B7" recorded 1.5 pressure),

ppp)     December 17, 2007 ("B9" recorded 1.5 pressure),

qqq)     December 20, 2007 ("B9" recorded 1.5 pressure),

rrr)     December 21, 2007 ("South" recorded 5.5 pressure),

sss)     December 24, 2007 ("B7" recorded 1.0 pressure),

ttt)     December 28, 2007 ("B7" recorded 0 (zero) pressure).

50.    This notice includes all days, including but not limited to those

identified above, where DMI failed to maintain a pressure drop across each

baghouse between two (2) and five (5) inches of water column. These days are known to or reasonably ascertainable by DMI by reference to its records.

51.    Each day that DMI failed to maintain pressure drop at each baghouse between two (2) and five (5) inches of water column constitutes a separate violation of:

> a) Permit 06-DCF-166 §§ I.J.1.b.(3), I.K.1.b.(3), I.L.1.b.(3), I.M.1.b.(3), I.N.1.b.(3), I.O.1.b.(3), and/or I.P.1.b.(3);
>
> b) Permit 07-DCF-003 §§ I.L.1.b.(3), I.M.1.b.(3), and/or I.O.1.b.(3);
>
> c) Wis. Stat. § 285.60;
>
> d) Wis. Admin. Code § NR 406.10;
>
> e) Section I.Y.4. of Permit 06-DCF-166;
>
> f) Section I.ZZZ.3 of Permit 07-DCF-003; and
>
> g) Section II.L. of each permit.

52.    Section II.D. of permits 02-RV-166, 06-DCF-166, and 07-DCF-003 required Didion to notify DNR by the next business day of certain violations of permit conditions.

53.    Wis. Admin. Code § NR 439.03(4) contains the same requirement.

54.    DMI did not inform the Wisconsin Department of Natural Resources of its failures to collect and report the air quality samples until, at the earliest, February 13, 2007. That "notification," however, did not comply with the requirements of Wis. Admin. Code ch. NR 439.

55.    There is no evidence that DMI ever notified DNR by the next business day of any of the violations identified above.  Each day that DMI failed to notify the DNR on the next business day of each of the violations identified in this notice constitutes a separate violation of § II.D of each of DMI's permits and of Wis. Admin. Code § NR 439.03(4).

56.    Section II.K of permits 02-RV-166, 06-DCF-166, and 07-DCF-003 prohibits DMI from using any article, process or method to conceal an emission, which would otherwise constitute a violation of an applicable rule, and from rendering inaccurate any monitoring device or method.  This prohibition is also contained in Wis. Admin. Code §§ NR 439.03(12) and NR 439.10.

57.    DMI rendered the particulate air quality monitor inaccurate by failing to report results from June, 2007, to the present.  Additionally, DMI rendered the monitor inaccurate by tampering with, shutting off, or otherwise manipulating the monitor to prevent a full 24-hour sample from being recorded.

58.    Each such occurrence constitutes a separate violation of Section II.K of each of DMI's permits and of Wis. Admin. Code §§ NR 439.03(12) and NR 439.10.  Each day constitutes a separate violation of each separate provision.

## CITIZEN SUIT ENFORCEMENT

The citizen suit provision of the Clean Air Act allows Cambrians to commence suit in a United States district court against you for violations of an emission standard or limitation.  42 U.S.C. § 7604(a).  An emission standard or

limitation is defined as to include any emission limitation, standard, or schedule,

any permit term or condition, and any requirement to obtain a permit as a

condition of operations.  42 U.S.C. § 7604(f).  Additionally, the citizen suit

provision allows Cambrians to file suit immediately, without providing sixty (60)

days notice, for DMI's construction of a major stationary source of particulate

matter air pollution without complying with PSD.  42 U.S.C. § 7604(a)(3).

Cambrians intend to enforce the Clean Air Act against DMI immediately for

violations of PSD and, at the expiration of a 60 day notice period, for the

additional violations identified above.

If you believe any of the facts described above are in error or have any

information indicating that you have not violated the Clean Air Act we urge you

to contact the undersigned counsel immediately.

If you wish to enter negotiations, please contact the undersigned attorneys

as soon as possible.  If we do not hear from you within twenty days of this notice,

or if you take any actions that indicate an unwillingness to negotiate in good

faith, we will assume that you have declined this settlement offer and will take

immediate steps to file an action.

Sincerely,
Garvey McNeil & McGillivray, S.C.

Christa O. Westerberg
David C. Bender
Attorneys for Cambrians

Clean Air Act Notice of Intent to Sue
Page 24 of 24
February 18, 2008

BY CERTIFIED MAIL

Stephen L. Johnson
US EPA Administrator
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Mary A. Gade
Regional Administrator, Region 5
United States Environmental Protection Agency
77 West Jackson Blvd.
Chicago, IL 60604

Secretary Matthew Frank
Wisconsin DNR
101 South Webster Street
Madison, WI 53702

Attorney General J.B. VanHollen
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53703

Thomas Dawson
Environmental Protection Unit
Wisconsin Department of Justice
17 West Main Street
Madison, WI 53703

Governor Jim Doyle
State of Wisconsin
115 East State Capitol
Madison, WI  53702

Hon. Michael Mukasey
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

EXHIBIT U

## Hughes, Michael A (27469)

| | |
|---|---|
| **From:** | David Bender [bender@gmmattorneys.com] |
| **Sent:** | Wednesday, February 20, 2008 8:46 AM |
| **To:** | Hughes, Michael A (27469) |
| **Subject:** | Notice of Intent |
| **Attachments:** | Notice of Intent to Sue 2.18.07.pdf |

Michael,

Attached please find a notice of intent that is postmarked Monday but, because of the holiday, went out yesterday.  If you have any questions, please do not hessitate to contact me.

David C. Bender
Garvey McNeil & McGillivray, S.C.
634 W Main Street, Ste 101
Madison, WI 53703
Tel. 608.256.1003
Fax. 608.256.0933

This message and the information contained herein may be confidential.  This message is intended for the use of the recipients named above.  If the reader of this message is not the intended recipient, please return the message to the sender and delete any copy or original- including digital and hard copies.  Copying or distributing this message is prohibited without the consent of the intended recipient.